CORNELIUS DOREMUS v. The MINISTER, ELDERS AND DEACONS OF THE DUTCH REFORMED CHURCH in the English Neighborhood.

In the Reformed Dutch Church, under the statute of New Jersey, incorporating religious societies, the civil office of trustee grows out of the ecclesiastical office of minister, elder, or deacon. Every minister, elder, or deacon, properly called and instituted, is, *virtute officii*, a trustee, and must necessarily remain such as long as his ecclesiastical office continues.

Ministers, elders, or deacons, lawfully elected and ordained, and thus inducted into office, though they afterwards secede, renounce the authority of the classis and general synod, and unite with another ecclesiastical body, do not thereby divest themselves of their offices.

There must be a removal or amotion, by a competent power, to determine an office.

If there be a resignation, the resignation must be accepted; and if there be an absolute vacation of an office, such vacation must be recognised and acknowledged.

When the original title of an office is sufficient, though good cause of amotion be shown, even in a case where the charter declares that for such cause of amotion the officer shall vacate his office, the office is not determined until there be an amotion.

When persons are officers *de facto*, they are in *colore officii*, and their acts will be valid until they are lawfully ousted; and more especially as they respect third persons, their acts are binding on the corporation.

[Doremus v. The Dutch Reformed Church.]

Is a court of equity the proper tribunal in which to try the question of forfeit-
ure of office ? *Quere.*

BILL for foreclosure and sale of mortgaged premises. The
mortgage bears date on the second day of February, eighteen
hundred and twenty-four, and was executed to the complainant
by certain persons styling themselves the minister, elders and
deacons of the Dutch Reformed Church of the English Neighbor-
hood, in the county of Bergen, under a seal purporting to be the
corporate seal of said corporation, to secure the payment of a bond
bearing even date, and conditioned for the payment of two hun-
dred dollars, with interest from the first of May, eighteen hun-
dred and twenty-four.

The defendants, (the individuals by whom the bond and
mortgage were given having been removed from office,) by their
answer, deny the existence of the mortgage debt. They also
deny the execution of the bond and mortgage under the corpo-
rate seal, and allege that if there be such bond and mortgage,
they were not given by the corporation, but by certain persons
claiming to be the corporation, but who, in fact, had seceded from
the church and dissolved their connection with the classis of Ber-
gen and with the general synod of the Dutch Reformed Church,
and thereby had ceased to be officers and to have authority to
make contracts or bind the corporation : That the fact was
known to the complainant, who was himself one of the seceders.
The defendants, also, in their answer, allege that the bond and
mortgage were given through fraud and collusion, for the pur-
pose of compelling the payment of money not actually due, or of
obtaining a title to the property covered by the mortgage. A re-
plication having been filed, testimony was taken by both parties,
and the cause was heard upon the pleadings and proofs.

*Mr. Vanarsdale,* for the complainant.

The answer denies the existence of the debt. It denies the
execution of the bond and mortgage ; and then insists that, if

[Doremus v. The Dutch Reformed Church.]

there is such bond and mortgage, they were not given by the true corporation, and were made through collusion and fraud.

*First.* As to the execution of the instruments : They are both under the seal of the corporation—proved by Van Saun and Demarest.

The book of minutes contains an order of the corporation for the execution of the bond and mortgage. The entry is on the twenty-ninth of August, eighteen hundred and twenty-three. The papers were executed on the second of February, eighteen hundred and twenty-four, by order of the corporation.

A corporation seal being affixed to an instrument, is *prima facie* evidence that it was properly done. The objecting party must show the contrary : *Ang. and Ames*, 115 ; 1 *Kyd.* 268 ; 6 *Serg. and Rawle*, 12 ; 3 *Hals.* 183 ; 7 *Serg. and Rawle*, 530 ; 1 *Ves. and B.* 226.

The formal execution of the bond and mortgage are fully proved.

*Second.* The great objection is, that the individuals by whom the bond and mortgage were given, have seceded from the church ; and, therefore, the instruments are not valid.

They *agreed* to secede in January. It is nothing more than saying they *would separate*—that is, of itself, no separation. Such an act may lay the foundation for a dismission or sentence against them ; but they remained elders and deacons until the sentence was passed. There were none others—they were in *colore officii.* The passing of the vote to secede did not turn them out of office : *Ang. and Ames*, 73 ; *Slee* v. *Bloom*, 5 *John. C. R.* 377.

This is an attempt to get the decision of the court collaterally, as to their right to office, instead of bringing up the question directly. This cannot be done : *Silver Lake Bank* v. *North*, 4 *John. C. R.* 373.

Non-residence is a forfeiture of office ; but it must be declared so by the corporation itself. It must avail itself of the law. The court of chancery will not declare a forfeiture : 2 *T. R.* 772.

In a *quo warranto* against an officer, the right of an elector

cannot be tried. That is a separate question, and there is another mode of trying it: *Cowper*, 507.

The consistory remained officers *de facto*, and an officer *de facto* is sufficient for the public.

The office is not determined until *amotion*, and that amotion is by the corporation: *Ang. and Ames*, 487; 2 *Stra.* 819; *Sayre*, 248; *Kenyon's Cas.* 26; 5 *Bro. P. C.* 299; 2 *T. R.* 776.

This is a sound doctrine. The court is required to say that the individuals by whom the bond and mortgage were given, were not legally in office. The answer is, we find them in office; we take them to be rightly there, and cannot examine into that matter in a collateral way.

Whether they are rightfully in office must depend on the judgment of the ecclesiastical tribunals. The court may decide one way, and they may decide another, and then there is a conflict. It is not the spirit of this court to invade the jurisdiction of other courts.

It is proved that those persons were the minister, elders and deacons, *de facto*, of that church: *Ang. and Ames*, 158; *Andrews' Rep.* 163.

This proposition would be sufficient, if we were driven to depend on it; but we are not. We have stronger ground. The individuals by whom the bond and mortgage were given, were duly elected to office. The classis of Bergen convened almost a fortnight after the execution of the bond and mortgage. Charges were preferred against the minister, &c., before the classis. Classis dissolved the connection between the minister and the congregation on the eighteenth of February, eighteen hundred and twenty-four. Up to that time, he was considered as the minister of the church. The defendants ask the court to decide that these men were dismissed a fortnight before. There will then be two judgments in this matter. The sentence deposing them, recognise them as actual officers up to that period. There were no others.

We find that the classis reviewed and reversed their own decision as to two of the consistory deposed, and gave them notice that they might be heard. They were then in their offices. This

reversal took place in April, eighteen hundred and twenty-four, at a regular meeting. In May following, Mr. Banta, who had been deposed, and was restored, was duly notified to attend a meeting of the consistory of the church of English Neighborhood. He was thus treated and recognised by the new consistory as a member. There were but six elders and deacons chosen—Banta and Lydecker, of the old consistory, making the eight—the whole number.

It is a well settled principle in equity, that though formalities may be wanting, just contracts must be abided by : 3 *Atkyns*, 478 ; 2 *Atkyns*, 45.

The corporation is bound, if the property came to the use of the corporation : *Kyd on Cor.* 314.

This money was applied to the building of a lecture room and school house. These were proper objects. The church so concluded. The complainant made a present of the ground. The debt was for building the school house—not for the lot. The church enjoys the house to this day, as a school house and lecture room.

In the next place, the defendants, by their answer, insist that they do not owe the money. On this subject, the corporation, which is an ecclesiastical one, should have been careful.

The testimony of C. T. Demarest gives the whole history of the subject. The account is produced ; the consistory agreed to the account, and said it was right. They settled at two hundred dollars, and agreed to give bond and mortgage. The money has been actually paid out of the pocket of the complainant, on the faith of the promise of this corporation to repay it.

It was agreed, before any act of secession, that when Doremus made the deed and paid the money, he was to have the bond and mortgage. It was not a sudden thing, in the nature of a contrivance.

With the mass of evidence produced, the court must be satisfied that the claim is just—it being for the school house now used and occupied by the church or congregation.

What, then, is to become of the answer of the corporation ?

What would such an answer be in case of an individual? It would ruin it, and the answer would be good for nothing. The answer to the principal allegation is unqualified, and is not true. They deny that they owe the debt, or any part of it. They charge design to defraud the church out of its property. There is no pretence for it, in any way. The defendants are actually enjoying the benefit of this property. The complainant is a benefactor of the church; he asks here for the payment of an honest debt, and he is denied his just rights.

*Mr. Williamson,* for the defendants.

The amount is small, but the principles involved may be of great importance to religious incorporations in our state.

It is alleged that the church is seeking to avoid the payment of an honest debt. This is a begging of the very point in dispute. I shall show that the debt is not just or honest.

1st. Are the bond and mortgage to be considered as corporate instruments?

We deny that they are corporate instruments, so far as the defendants know and believe. Is there any evidence that these are corporate instruments? To make them such, it must be shown that the seal was attached to them by some person authorised to do it, and for the purpose of giving effect to it, as a corporate instrument.

The paper is signed by them as individuals; they say they have set *their* hands and seal—not the common or corporate seal. It does not, on the face of it, purport to be a corporate seal. Can they, then, call witnesses to prove it? Can this be considered as *prima facie* evidence of the common seal?

But, do they prove the fact that this is the common seal? We think not. It is not sufficient to prove that they were elders and deacons—though even that is not shown, but by their acts. It must be shown that some *one* was authorised to affix the seal—it cannot be done by all. A witness cannot properly prove the *regularity* of the execution—it is a conclusion of law.

43

But the main point for which I contend is, that the persons who executed this bond and mortgage were not trustees of the church when the bond and mortgage were executed. They had divested themselves of their authority, by the secession of the twenty-ninth of January, and of the second of February, eighteen hundred and twenty-four—both of which were previous to the mortgage.

It appears that this church was incorporated in eighteen hundred and nine. They were a component part of the classis of Bergen, which was subordinate to the general synod. A schism took place. There grew up a true Reformed Dutch Church, with a separate government. This took place before January, eighteen hundred and twenty-four. At that time, this minister and consistory resolved to change their allegiance, and become members of a new body ; and they denounced the church, declared the connexion absolutely dissolved, and took measures to connect themselves with the other church. They acknowledged themselves to be subordinate to the *true* Reformed Dutch Church. If they ceased to be members of the church, they could not be officers. Could they be continued members of the church against their will?

They were actually accepted and received by the new church, before the execution of the bond and mortgage. They appointed a committee to wait on Dr. Frœligh ; and on the second of February, eighteen hundred and twenty-four, he met with the consistory—and commissioners were present from the True Reformed Dutch Church. They were formally received by Dr. Frœligh, who gave them the right hand of fellowship. All this was done before the execution of the bond and mortgage.

What was the legal effect of this separation and secession? Were they members of both churches? Could they become members of the new church, and yet be members of the old? Our law is founded on religious toleration : A man cannot be kept a member of any religious society without his own consent. A contrary doctrine cannot obtain in New-Jersey—it is opposed

to universal opinion.  There is no law in the Reformed Dutch Church of that effect.

If these men had a right to choose their own religious society, and to withdraw, did they not do it?—Did they not exercise the right?

The great principle decided in the case of *Hendrickson* v. *Decow, Saxton*, 577, was, that the law exercises no restraint over a man's conscience.  The chief justice did not think it was necessary to deal with them in order to cut them off.  What right have these persons, who have thus separated themselves, to call themselves members of the old church?  When did the connexion cease?  And especially as to those who have not been dealt with—how do they stand?

Two things are necessary to church membership—faith, and submission to the government and discipline of the church: 7 *Hals.* 214.  If individuals refuse to submit to the government, they are no longer members of the church.  It has been contended that this court has no jurisdiction to decide this question in a collateral way.  The court must decide whether those persons were legally trustees—it is necessary, to decide the right of property.

If a man by his own act ceases to be a member, he can never set up that he is an officer of the church.  This court cannot try a question of forfeiture; but the question is here, whether they have not ceased to be officers and members of a certain religious community.  There are many instances in which this court will take jurisdiction of matters, in a collateral way, where it cannot reach them directly.

These persons, disdaining the authority and jurisdiction of the church to which they were attached, cannot undertake to dispose of the property of that church.

It is said they are officers *de facto*, and must be considered as acting legally, so far as third persons are concerned.  The case is not within that principle.  Here is no dispute as to the regularity of the election; but they deny that they are any longer under the authority or jurisdiction of the classis or synod, or of the church

to which they originally belonged. They have renounced it. My great principle is, that a man by becoming a member of one church, ceases to be a member of any other—he cannot be a member of both; and that, in this country, a man may attach himself to any denomination he pleases.

In the second place, I contend that there is no evidence of any just consideration for the bond and mortgage, and that it was fraudulent in its inception and completion.

The persons who executed the bond and mortgage, had separated from the church; they made themselves judges in their own case, and undertook to exercise power over the property of other persons.

Three items composed the bond and mortgage, viz.: 1. The account of Doremus himself. 2. The demand of Demarest, the president of the consistory. 3. The demand of Westervelt.

1. As to complainant's own account—there is no evidence that it is just and fair. There is no evidence that it was ever exhibited or presented to the church. It was never brought forward until they actually separated—then we first hear of it. Here are the books; but they say the consistory allowed it. Why, these are the very people we complain of. They ought not to be judges. The account is not proved, and there is no evidence to prove it.

2. As to the demand of Demarest—he brings forward a note, dated in May, eighteen hundred and twenty, and a receipt of Westervelt. The receipt proves that the money paid was not out of the church funds, and was paid by the consistory. No voucher was taken to show that the money was paid by him individually. The entry of the twenty-fourth of May, eighteen hundred and twenty-three, shows the state of the pecuniary affairs of the church. *It was then stated that every debt was paid, and that there was money over.* Was not this debt a church debt? If not, then why did the church undertake to pay it? What then becomes of the fairness and honesty of this debt or claim?

But we are told that this corporation have had the benefit of the contract. It is true—and they have paid for it. Why did

the complainant assume this debt ? He never would have done it, if he had not been about to leave the church. It was a piece of management.

THE CHANCELLOR. On the second day of February, eighteen hundred and twenty-four, Cornelius T. Demarest, James Ly-decker, Peter Banta, Jacob T. Moore, John W. Banta, John Edsall, Frederick Devoe, David Westervelt, and Bradley Randall, styling themselves the minister, elders and deacons of the Reformed Dutch Church of the English Neighborhood, in the county of Bergen, executed to the complainant, under a seal purporting to be the corporate seal of said corporation, a bond and mortgage for the payment of the sum of two hundred dollars, with interest ; and the present suit is brought for the recovery of this amount, now due.

The defendants, in their answer, deny the debt, and also the execution of the instruments under their common seal, and allege that if there be such bond and mortgage, they were not given by the corporation, but by certain persons claiming to be the corporation, but who, in fact, had seceded from the church, and dissolved their connexion with the classis of Bergen and the general synod of the Reformed Dutch Church, and thereby ceased to be officers and to have authority to make contracts and bind the church ; that this fact was known to the complainant, who was himself one of the seceders ; and that the bond and mortgage were given through fraud and collusion, for the purpose of compelling the payment of money not actually due, or of obtaining a title to the property covered by the mortgage.

A replication has been put in by the complainant, and testimony has been taken on both sides.

On looking into the evidence, I think it sufficiently proved that the debt was due to the complainant. Some little time before, a house had been built by the congregation, at New Durham, for a school house and place of worship. It was near to the residence of Mr. Doremus, the complainant, who had given the ground. Mr. Demarest acted as one of the committee to superintend the

building of the house, and Peter Westervelt, jr., was the builder. At the time the bond and mortgage were given, it appears there was due to Westervelt a balance of fifty dollars; to Cornelius T. Demarest, for money advanced by him to Westervelt, eighty-one dollars and twenty-five cents, and four dollars and eighty-six cents interest; and to the complainant, for boarding of hands and work and labor done, sixty dollars, and three dollars and sixty cents interest—making in the whole one hundred and ninety-nine dollars and seventy-one cents; to which the sum of twenty-nine cents was added, to make up the amount of two hundred dollars. The complainant agreed to assume and pay the debts to Westervelt and Demarest, provided the consistory would give him a bond and mortgage for the whole, including his own account; and this was agreed to and done; and I see nothing in the evidence to induce the belief that the claim is in any degree fictitious or unjust. The present defendants are now in possession of this house, and peaceably enjoy the benefit of it.

I am further of opinion that the due and proper execution of the instruments are sufficiently proved. They are executed by the minister, elders and deacons of the church, constituting the corporation, and under the corporate seal, and in pursuance of a resolution adopted by and entered on the minutes of the corporation; and this is sufficient, as between these parties, for the purposes of the present suit.

The only serious difficulty in this case grows out of a question which has been raised as to the legal right and power of the grantors to execute the papers and bind the property of the church.

To a correct understanding of this question, it is necessary to premise, that, prior to the execution of the bond and mortgage, the persons executing them were severally members of the Protestant Reformed Dutch Church. Cornelius T. Demarest had been, some years before, called by the congregation at the English Neighborhood, as their minister, and had been duly installed into his sacred office by the classis of Bergen, according to the rules and orders then existing and established for the government

of the church; and, according to the same rules and orders, the persons professing to be the elders and deacons of said church, had been regularly chosen and ordained to their respective offices, and were afterwards duly sworn, according to the requirements of the law. As a corporation, under the name of The Minister, Elders and Deacons of the Dutch Reformed Church at the English Neighborhood, they were, according to the constitution of the church and the law of the state sanctioning said constitution, authorised to take charge of and manage all the temporal or secular affairs of the church and congregation. *Prima facie*, then, the acts of the consistory, that is to say, of the minister, elders and deacons of the church, who constituted the corporation, were valid and binding on the church and people whom they represented, and upon their successors in office.

It appears that about the time the transactions in question took place, difficulties had arisen in some parts of the Reformed Dutch Church, in the states of New-York and New-Jersey, by reason whereof, some members seceded and separated themselves from the church, denounced it as corrupt, disdained its authority and jurisdiction over them, and united themselves together to constitute what they denominated the true Reformed Dutch Church. Among those thus seceding, were the grantors of this mortgage— that is to say, Mr. Demarest the minister, and the elders and deacons of the church at the English Neighborhood.

The bond and mortgage bear date on the second day of February, eighteen hundred and twenty-four.

On the twenty-ninth of January preceding, the consistory held a meeting, at which all the members were present, except Jacob T. Moore. At this meeting, the proceedings of a meeting of sundry heads of families of the congregation were read; and it appeared that a large majority of those convened had advised a separation of their connexion with the classis of Bergen: whereupon, the following declaration and resolutions were made and entered into by the consistory, and recorded on their minutes, viz. :

"Now, therefore, for the truth's sake and for conscience's sake,

we, the minister, elders and deacons of the Reformed Dutch Church of the English Neighborhood, do resolve,

"1st. That our connexion with the classis of Bergen and with the general synod, be and hereby is dissolved.

"2d. That we are and design to remain what we always have been, a true Reformed Dutch Church, adhering steadfastly to the constitution of the Reformed Dutch Church, and to the word of God, upon which we believe said constitution to be grounded.

"3d. That we acknowledge ourselves to be subordinate to none other than the classis and synod of the true Reformed Dutch Church, whose reasons for separating from the general synod, contained in their printed pamphlet, we approve and adopt, and do hereby declare ourselves to be united with them in the bonds of faith and love.

"4th. That James Lydecker and John Edsall be a committee to wait upon the Rev. Dr. S. Froeligh, with these resolutions, for his advice, and also to know whether he has authority to receive us."

At this same meeting, the deed from Cornelius Doremus, the complainant, to the corporation, for the lot of land on which the mortgage is given, was presented and accepted.

The following minute was then made, to wit: "It was ascertained, from the bills and receipts, that there remained a debt due on the building of the said school house and lecture room, of two hundred dollars; and, whereas, Mr. Cornelius Doremus is willing to advance the money for the payment of said debt, provided the consistory will secure him by a bond and mortgage on said house and lot at New Durham, *Resolved*, That a bond and mortgage be prepared accordingly."

On the second of February, eighteen hundred and twenty-four, another meeting of the consistory was held, at which all the members were present. There were also present Dr. Solomon Froeligh and Elder Isaac Van Saun, as commissioners of the classis of the true Reformed Dutch Church, who were received and acknowledged as such by the consistory. The

following minute then appears on the record of their proceedings: "The Rev. Dr. Solomon Frœligh asked whether this consistory had determined unanimously to dissolve their connexion with the classis of Bergen and the general synod, and to place themselves and this church under the care of the classis and synod of the True Reformed Dutch Church, and pledge their honor to subscribe the printed reasons for leaving the general synod? Each one of the elders and deacons answered in the affirmative. Whereupon, the reverend doctor, in token of their reception, gave to each member the right hand of fellowship."

Then comes the following: "The mortgage and bond referred to in the minutes of the last meeting, having been prepared, according to order, were presented and read, approved of, and duly executed by the signatures of the president and members, and the seal of the corporation."

On the tenth of February, eighteen hundred and twenty-four, the consistory again met, and the mortgage was acknowledged before John A. Westervelt, esquire.

On the seventeenth and eighteenth of the same month of February, Cornelius T. Demarest was, upon due notice given, tried upon charges preferred against him, by the classis of Bergen, and suspended from the ministry ; and, at the same time, the elders and deacons were, by the said classis, deposed from their respective offices ; and the members of the church were directed to supply the vacancies by the appointment of others.

Under this state of things, the question arises whether the acts of giving and executing the mortgage and bond are to be considered as valid and efficacious, so as to bind the property of the corporation.

According to the constitution and usages of the Reformed Dutch Church, the consistories of the church, composed of the minister, elders and deacons of each church, have the charge and control of all the temporal as well as spiritual concerns of the church and congregation. This is one of the peculiar features of the form of church government appertaining to that denomination of Christians. In seventeen hundred and ninety-nine,

44

when the general law was passed to incorporate trustees of religious societies, the legislature, willing to communicate equal privileges to all, enacted that the minister, elders and deacons for the time being, or if there be no minister or ministers, the elders and deacons for the time being, of every Reformed Dutch congregation, should be trustees of the same, and a body politic and corporate in law, by such name as the said trustees should assume : that by such name they should be able to acquire and hold property, have a common seal, sue and be sued, &c. And it further enacted, for the purpose of perpetuating a line of succession in the trustees, that those in office at the time of taking and recording a name as aforesaid, should continue in office until others should be duly elected, appointed or called, according to the manner, usages and customs of the church.

The result of the enactment is this, that, in the Dutch church, the consistories respectively, duly elected, appointed or called, are the legal trustees. They are recognized by the statute. The civil authority interferes in no way with their selection or appointment ; but, leaving that to the church, it simply vests them, when duly selected and appointed, with all the rights and powers in regard to property, that the trustees of other religious denominations enjoy ; and, to perpetuate the succession, declares that those in office shall remain in, until others are chosen.

It is evident, then, that the civil office of trustee grows out of the ecclesiastical office of minister, elder or deacon. Every minister, elder or deacon, properly called and instituted, is, *virtute officii*, a trustee ; and he must necessarily remain such as long as his ecclesiastical office continues. When such office commences, how long it shall continue, and when and how it shall terminate, are matters which would seem to belong *primarily* to the ecclesiastical judicatories to determine.

In the case before me, the question of the power of the consistory to execute the bond and mortgage, must depend on the solution of another question, viz. : whether they were in office or not at the time. According to the law of the church, and the deci-

sions of their acknowledged tribunals, I think there can be no doubt that they were in office.

In the first place, they were lawfully elected and ordained, and thus formally inducted into office. They afterwards seceded; they renounced the authority of the classis and general synod, and at the very meeting at which the papers were executed, they joined themselves to what was called the True Reformed Dutch Church. They no doubt did all they could to unchurch themselves; but they did not resign, nor did they, by any other act, divest themselves of their offices. This is evident from the course taken by the church; for, secondly, the church, after their renunciation, considered, treated and dealt with them as officers. In no part of the proceedings which took place in consequence of the secession were they considered as having vacated their offices.

The whole subject came under the cognizance of the classis of Bergen, the proper judicatory of the church. No complaint was made to them that the consistory had vacated their offices, by seceding from the church and renouncing the authority of classis and synod. They did not investigate that matter, and declare that the offices were and had become vacant by the act of secession. On the contrary, they proceeded to try the consistory as being then in office and amenable to their authority. The charges against them were for slanderous abuse of the church generally, and also of the classis, and for public schism. They were tried according to the laws of the church, and found guilty; and the sentence of the court is as follows: " *Resolved*, That James Lydecker, Jacob T. Moore, Peter W. Banta, and John W. Banta, elders; Frederick Devoe, John Edsall, David J. Westervelt, and Bradley Randall, deacons, the present members of the consistory of the English Neighborhood, are guilty on both the charges to which they have been cited to answer, and that the seats of the said elders and deacons, as members of the consistory of the church at the English Neighborhood, be and hereby are declared vacant, and that said persons be and hereby are deposed from their respective offices."

No language can be plainer than that used by the classis.

That court declared, on the eighteenth day of February—sixteen days after the execution of the bond and mortgage—that the persons cited before them were then in office; that they were the "present members of the consistory;" and classis, by a judicial act of their own, disrobed them of their offices.     Up to that period, then, there was, in the opinion of the church, no vacancy; and, of course, so long as the consistorial office remained, the consistory were trustees, and had power over the temporal concerns of the church.

There is another act of classis which tends strongly to show their opinion on this subject.  On the twentieth of April, eighteen hundred and twenty-four, classis, at a regular session, reversed their sentence of deposition, so far as it related to Peter W. Banta and James Lydecker, two of the elders, on the ground that they had not been duly notified to attend and make defence; and the members of the church, instead of choosing an entire new consistory, elected four deacons and only two elders—thereby recognizing Banta and Lydecker as elders of the church at that time; and this was done by express order of classis.

This proves conclusively, if any further proof were necessary, that the regular courts of the church did not consider the secession of this consistory as divesting them of their offices.    They still held them to be members and officers of the church, and dealt with them as such; and the classis, whose rightful office it was, actually deposed them, and *thereby* created the vacancy, and ordered it to be filled according to the rules and customs of the church.

Considering this case, then, in reference to the law of the church, I consider the bond and mortgage as having been executed by the consistory of the church of English Neighborhood, lawfully authorized for that purpose.

This conclusion, founded on the acts and proceedings of the ecclesiastical tribunals, accords with the general principles of the law.   According to these, there must be a removal or amotion by a competent power, to determine an office.   If there be a resignation, there must be an acceptance; or if there be an abso-

lute vacation of the office, such vacation must be recognized and acknowledged. Where the original title of an office is sufficient, though good cause of amotion be shown, even in a case where the charter declares that for such cause of amotion the officer shall vacate his office, the office is not determined until there be an amotion : *Lord Bruce's case*, 2 *Stran.* 819 ; *Rex* v. *Heaven*, 2 *T. R.* 772 ; *Angell and Ames on Corporations*, 487.

Where persons are officers, *de facto*, they are in *colore officii;* and their acts will be valid until they are lawfully ousted; and more especially as they respect third persons they are binding on the corporation : *Trustees of Vernon Society* v. *Hills*, 6 *Cowen*, 22 ; *Baird* v. *Bank of Washington*, 11 *Serg. and Rawle*, 411 ; *Angell and Ames on Corp.* 73, 74.

These are principles which need not be explained or enforced. As applied to this case, they lead to the result that the consistory were the trustees of the property when they undertook to deal with it.

There is another view of the case, which presents itself for serious consideration. These persons having been lawfully elected to their offices, their acts, if *bona fide*, must be considered valid, unless it be true, as the defendants contend, that their offices were forfeited by reason of their own misconduct. Is a court of equity a proper court in which to try the question of forfeiture ? It cannot entertain the question directly. It ought not to pass upon it collaterally or incidentally, except in cases of necessity, if any such may arise. Questions of forfeiture do not appertain to this tribunal : *Slee* v. *Bloom*, 5 *John. C. R.* 377 ; *The Society for the Establishment of Useful Manufactures* v. *The Morris Canal*, &c., *Saxton*, 157. And if this court should determine that there was actually a forfeiture, how would such determination be reconciled with the judgment of the spiritual court on the same subject ? If these men were not trustees, they were not elders and deacons—the acts of classis have been irregular, and this court must collaterally declare them void. All this would be unpleasant to the court, and might be attended with unhappy consequences.

[Doremus v. The Dutch Reformed Church.]

In my view of the case the complainant is entitled to recover; and I think it is just and right, as between these parties, that he should recover. The defendants (the corporation) are in the enjoyment of the property of which this is a part consideration. There is a strong equity growing out of that circumstance alone; so much so, that it has been held that when property comes to the possession of a corporation, they are bound to pay: *Kyd on Corp.* 314. Suppose the bond and mortgage were set aside for want of legal right in the corporation at the time, would that pay the debt? Would not equity require the satisfaction of it? Upon that point there should be no doubt.

Let it be referred to a master to take an account.