### JOHN SCHILSTRA et al.

*v.*

### ARIE J. VAN DEN HEUVEL et al

[Decided July 14th, 1913.]

1. Where a bill was filed for the regulation of the affairs of a religious society, known as the Northside Christian Reformed Church of Passaic, upon the ground that there was a misappropriation of the property and temporalities of that society, the same having been diverted by a faction of the church to the denomination known as the Reformed Church in America, and the bill is filed by the complainants not only on their own behalf, but also on behalf of all members of the same congregation who are similarly situated, and alleges there is a schism in the church, and that a faction represented by the defendants has seceded therefrom and joined another denomination; that the seceders have obtained possession of the church property, and, without the consent of the complainants and their adherents, are attempting to carry the church property with them and place it under the control of such other denomination, and the complainants claim that this is being attempted not only against the substantive rules of law regulating affairs of religious societies, but that it is done and is being done, in an unlawful and irregular manner, and that the result is, that the defendants committed a breach of their trust as trustees of the Northside congregation in despoiling it of its property, and the bill seeks a restoration of the property to the denomination to which it originally belonged, and to enjoin the defendants from intermeddling with it or its possession or use as one of the churches affiliated with the Christian Reformed Church of America; and at the instance of this court proceedings by way of *quo warranto* were taken at law, in the form of a rule to show cause why the writ should not issue for the purpose of testing the right of certain of the defendants to hold the offices of elder and deacon, and consequently, the office of trustee, resulting in a rule of the law court discharging the rule to show cause in favor of the respondents, upon the ground that their title to their offices was unimpeachable, that the meet-

ings, at which it was voted to secede were regularly called and held, and that the right to secede existed.—*Held*, that the judgment in the supreme court cannot be held to be such an adjudication upon the merits upon the controversy as will preclude the examination into the matter in the present proceedings.

2. The parties to the *quo warranto* proceedings are slightly different from the parties to this suit, and the issues in this suit are much broader and more various than those presented by the supreme court record.   There the sole issue was whether *quo warranto* proceedings should be instituted to test the title of certain of the defendants herein to the offices of elders and deacons or members of the consistory of the religious society.   The bill in this case raises the further question as to whether the defendants and a faction of the congregation have a right to secede from one denomination and join another denomination and take the church property and temporalities with them.   A mere statement of these differences is a demonstration that the doctrine of *res judicata* cannot apply to this case.

3. Primarily, the title to the office of elder or deacon or trustee must be litigated at common law; but it is likewise true that there is a class of cases in which courts of equity have examined the title to an office where there was some paramount equity to which the question of official title or authority was merely incidental.

4. According to the decisions in this state the action of the defendants and their adherents is void, in so far as it attempts to subject the property in question to the control of the authorities of the Reformed Church in America; it is a breach of trust on the part of the defendants to assist in or connive at the transfer of the property in question from one ecclesiastical body to another without the consent and concurrence of all concerned, or without a proceeding whose validity and effect is beyond contention.

5. The proceedings for the transfer of a portion of this congregation and the whole of its property to the Reformed Church in America examined, and *held*, irregular and disorderly to such an extent as to be voidable on the complaint of any one interested.

6. The rules of law relating to freedom of action by independent churches and congregations are different from those rules which apply to congregations which are affiliated with, and are subordinate to, higher judicatories.   Independent churches may do what they please with their property, provided legal action is taken to that end, but when a religious society becomes affiliated with other religious societies, and they unite to construct and maintain for their mutual advantage higher judicatories to which they subject themselves, then the individual society or worshiping unit holds its property and temporalities under an obligation to continue the affiliation until it can be broken by mutual consent; and if secession is attempted by a faction however large or however small, such faction will not be allowed to carry the church property with it, certainly not so long as there is a loyal body which is recognized by the superior judicatory.

7. In case of a schism in a church which is in connection with, and a constitutent part of, an ecclesiastical organization, and which has a head invested by its constitution or recognized usage with other supervisory and supreme control over the constitutent parts to determine all questions producing schisms and divisions between members, and to recognize and decide what faction is in the right, it is a well-settled law of the civil courts that the title to the property is in that part of the congregation which is acting in harmony with its own law and the ecclesiastical laws, usages, customs and principles which were accepted among them before the dispute began, which are the standards for determining which party is in the right.

8. As to the status of the defendants—they were at one time elected trustees of the Northside church, and it was by virtue of their office as such trustees that they were enabled to obtain and hold possession of the church property, but having voluntarily severed their connection with the Christian Reformed Church, and having become members of another denomination, they have by their own act so far renounced their trusteeship as that they can no longer represent the church society in that capacity or any longer meddle with its property and affairs.

9. While it is incompetent for this court to oust a trustee from his office of trustee of a religious society, it, however, does have the power and jurisdiction to declare that such a person has by his own act voluntarily renounced his office, and in this case that is what the defendants have done. They no longer act as trustees for the Northside Church of the Christian Reformed Church of Passaic, they are acting as trustees of a church of an entirely different denomination and the effect of that is that they cannot be considered trustees of this society.

10. The same thing is true of the defendant Van Den Heuvel. He was under ecclesiastical censure at the time the secession took place and had been deprived of his right to minister to the congregation, which action had been sustained by the superior judicatories of the church. It was therefore unlawful for him to occupy the pulpit of that church and to accept a call to be its pastor and to officiate as the minister of the church until the ecclesiastical censures were removed. By his own voluntary act also, he has renounced his connection with the Northside church, and should not be permitted to officiate as its pastor.

11. The decree should be for the complainants and should adjudicate that the complainants are the sole trustees of the Northside church, and that they are entitled as such to the custody and possession of the church property. The defendants should be restrained from intermeddling with the property or from diverting it or attempting to divert it from the denomination known as the Christian Reformed Church of Passaic, and from retaining possession of or holding the property and temporalities of the church. There should likewise be an injunction against Van Den Heuvel restraining him from acting as pastor of the church or in any way ministering to the congregation as pastor.

On final hearing on bill, answer, replication and proofs.

*Mr. Lewis A. Allen* and *Mr. Andrew Foulds, Jr.,* for the complainants.

*Mr. George H. Dalrymple* and *Mr. Charles B. Bradley,* for the defendants.

HOWELL, V. C.

The bill in this case is filed for the regulation of the affairs of the Northside Christian Reformed Church of Passaic, upon the ground that there was a misappropriation of the property and temporalities of the church society, the same having been diverted by a faction of the church from the denomination known as the Christian Reformed Church in America. The bill is filed by five individuals who bring the suit not only on their own behalf, but on behalf of all members of the Northside Christian Reformed Church, who are similarly situated. · It alleges, in short, that there is a schism in the church, and that a faction represented by the defendants has seceded therefrom and joined the Reformed Church in America; that the seceders have obtained possession of the church property, and without the consent of the complainants and their adherents are attempting to carry the church property with them and place it under the control of the Reformed Church in America. They claim that this is being attempted not only against the substantive rules of law regulating affairs of religious societies, but that it has been done and is being done in an unlawful and irregular manner, and that the result is that the defendants committed a breach of their trust as trustees of the Northside congregation in despoiling it of its property. They seek a restoration of the property to the denomination to which it originally belonged, and to enjoin the defendants from intermeddling with it or its possession or use as one of the churches affiliated with the Christian Reformed Church of America.

The facts so far as they relate to the view now taken of the case will fully appear hereafter.

There is an objection raised at the outset of the case, namely, that the very point presented here was once litigated in the supreme court and decided in favor of the defendants, and hence is

*res judicata.* After the bill had been filed, and on a motion for preliminary injunction, the vice-chancellor before whom the motion was made directed that proceedings be taken at law, for the purpose of testing the right of the defendants to hold the offices of elder and deacon, and, consequently, the office of trustee, he in the meantime advising an order which has preserved the *status quo* until the final hearing. The proceeding so suggested was taken. It took the form of an order against Martinus J. Bast, John Groenhoff, John Zylstra, Frank E. Ruiter, Martinus Haakmeester and Peter H. Vanderplatt, on the relation of Nick Hornstra, Herbert Priss, John Shilstra, Leonard Wynbeek and William S. Pontier, requiring them to show cause why a writ of *quo warranto* should not issue to inquire by what warrant or authority they and each of them claimed to have, use and enjoy the offices, liberties, privileges and franchises of trustees and members of the consistory and elders and deacons of the Northside Christian Reformed Church of Passaic, and why leave to file an information therein should not be granted, and the respondents required to appear and plead or demur thereto. Depositions were taken, and on the argument the rule to show cause was discharged, with costs. In the opinion that was filed the court stated that the title of the defendants to their office was unimpeachable; that the meetings of January 7th and January 9th, 1912, at which it was voted to secede from the Christian reformed church, were regularly called and held; that the right to secede existed, and that the case in all its essential features was akin to the case of *Pulis* v. *Iserman, 71 N. J. Law (42 Vr.) 408.* The opinion proceeds upon the ground that the granting of the motion or the refusal of it is in its discretion; it consequently was dealing with a discretionary motion, from the decision of which there could be no appeal, and deciding against a motion which in the discretion of the court might be entertained again the next day. Such a situation arose in the case of *Selz* v. *Presburger, 49 N. J. Law (20 Vr.) 396.* There the defendant was arrested on a *capias* issued on the order of a supreme court commissioner, who adjudged that the defendant had fraudulently contracted the debt sued for and had disposed of his property with intent to defraud his creditors. Subse-

quently, he applied to one of the justices of the supreme court
for his discharge, upon the ground that the affidavits on which
the commissioner had made his order were insufficient.    This
motion was refused; thereupon he sued out a writ of. *habeas
corpus;* the return showing that he was detained by virtue of
the *capias,* he prayed his discharge upon the same ground as that
upon which he had based his application to the justice of the
supreme court.    The plaintiffs met him with the preliminary
objection that the determination of the justice was conclusive,
but Mr. Justice Dixon held that it was not.    He held that the
doctrine of *res judicata* is not applicable to summary determina-
tions by a subordinate tribunal, which are merely incidental, the
decision of which not being entered upon the record, cannot be
reviewed in the appellate courts.    See, also, *Pulis* v. *Iserman,
71 N. J. Law (42 Vr.) 413.*    Where the effect of a judgment
upon a motion is to absolutely settle rights of parties, and a re-
view .can be had, there is no doubt but that the judgment would
be *res judicata.*    Such was the opinion of Vice-Chancellor Pit-
ney in the case of *West New York Silk Mill Co.* v. *Laubsch, 53
N. J. Eq. (8 Dick.) 65.*    There a motion was heard by the
Hudson county circuit court to set off one judgment against
another.    It was refused, with costs, and one of the parties sub-
sequently filed a bill in chancery for the same purpose.    The
objection of *res judicata* was raised; the vice-chancellor held
that the former judgment of the circuit court was binding, and
that portion of the relief which was prayed in the bill was de-
nied; but it will be observed that in that case the original mo-
tion dealt with the rights of the parties finally, and that there
was a right of review.    The doctrine of the *Salz Case* is upheld
by the supreme court of Colorado in *Rockwell* v. *District Court,
17 Colo. 118.*    In *Scherff* v. *Missouri Pacific Railway Co., 81
Tex. 471; 26 Am. St. Rep. 828,* it was held that a judgment
within the authority of *res judicata* must be a definite judg-
ment of condemnation or dismissal upon the merits of the case.
This would seem to be dispositive of the point upon reason and
authority; but it will be likewise observed that the parties to
the common law litigation are slightly different from the parties
in this suit, and that the issues here are much broader and more

various than those presented by the supreme court record. There the sole issue was whether *quo warranto* proceedings should be instituted to test the title of the defendants to the offices of elders and deacons or members of the consistory of the Northside church. Conceding that they are, the bill in this case raises the further question as to whether the defendants and a faction of the congregation, upon the facts presented, have a right to secede from the Christian reformed church and join the reformed church in America, and take the church property and temporalities with them. A mere statement of these differences is a demonstration that the doctrine of *res judicata* cannot apply to this case. The argument, however, has the support of authority.

It was said by Mr. Justice Field, in the case of *Cromwell* v. *County of Sac, 94 U. S. 351,* that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action; in the former case the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action—not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.

The doctrine of this case was approved by this court in *Paterson* v. *Baker*, *51 N. J. Eq. (6 Dick.) 49*, and in *Clark Thread Co.* v. *William Clark*, *55 N. J. Eq. (10 Dick.) 658*. (See *Hoffmeier* v. *Trost*, *83 N. J. Law (54 Vr.) 358*.)

It is, therefore, quite apparent on either of the grounds above stated that the rule which was entered in the supreme court, dismissing the rule to show cause, cannot be held to be such an adjudication upon the merits of the controversy as will preclude the examination into the matter in the present proceeding.

It must be conceded that primarily the title to the office of elder or deacon or trustee must be litigated at common law; but it is likewise true that there is a class of cases in which courts of equity have examined the title to an office, but these are cases where there was some paramount equity to which the question of official title or authority were merely incidental. Such was the case of *Johnston* v. *Jones*, *23 N. J. Eq. (8 C. E. Gr.) 216*. There it is said by Chancellor Zabriskie that if the question of the legality of an election, or whether a certain person holds such an office arises incidentally in the course of a suit of which equity has jurisdiction, that court will inquire into and decide it as it would any other question of law or fact that arises in the cause, but that decision would be only for the purpose of the suit, and that it did not settle the right to the office or vacate it if the party was in actual possession; and he cites *Doremus* v. *Dutch Reformed Church* and *Den* v. *Bolton, supra.*

The complainants admit the right of these individual defendants and of the other individual members of the congregation to secede from the Christian reformed church and to affiliate themselves with any body that they may choose. But can they take the church property with them and emancipate it from the control of regularly elected trustees who are adhering to the form of church government and church authority to which the congregation was subject at the time it acquired the property?

It was held in *Doremus* v. *The Ministers, Elders, &c.*, *3 N. J. Eq. (2 Gr. Ch.) 332*, that "ministers, elders or deacons, lawfully elected and ordained, and thus inducted into office, though they afterwards secede, renounce the authority of the classis and gen-

eral synod, and unite with another ecclesiastical body, do not thereby divest themselves of their offices, but that there must be a removal or resignation and a total renunciation of the office.

And it was held in the *True Reformed Dutch Church of Paramus* v. *Iserman, 64 N. J. Law (35 Vr.) 506,* that as between two opposing factions of a religious association, land acquired by the association before any schism arose will remain the property of that faction which abides by the doctrines, principles and rules of the church government which the united body professed when the land was acquired.

And it was held in the *American Primitive Society* v. *Pilling, 24 N. J. Law (4 Zab.) 653,* that a congregation or inferior ecclesiastical corporation which, by its organization, is connected with and subject to the superior jurisdiction of the church to which it belongs, cannot, by the act of the corporation, or a majority, secede from the denomination, declare themselves independent, and take their corporate property with them.

These cases would seem to determine that the action of the defendants and their adherents is void in so far as it attempts to subject the property in question to the control of the authorities of the Reformed Church in America, and that it was a breach of trust on the part of the defendants to assist in or connive at the transfer of the property in question from one ecclesiastical body to another without the consent and concurrence of all concerned, or without a proceeding whose validity and effect is beyond contention.

The proceeding by which this attempt was made strikes me as irregular and disorderly, to such an extent as to be voidable on the complaint of any one interested. The whole proceeding for the transfer of a portion of this congregation and the whole of its property to the reformed church in America took place between January 4th and January 9th, 1912. Some time prior to January 4th new deacons and elders had been elected. They were to be ordained to their respective offices on January 7th. On January 4th objections were made to these men or some of them and the consistory of the church determined to delay the ceremony. On Sunday, January 7th, the defendant Bast announced at the close of the morning service that there would be

a meeting of the congregation in the evening to *consider the installation* of the new elders and deacons. On the same day, and at the afternoon service, the clergyman who ministered to the congregation announced that such meeting would be illegal. Nevertheless, a meeting was held in the evening at which forty-nine persons were present. It must be clear that this meeting was irregular, and that its action could bind no one, except possibly those who were present and acting.

The congregation at this meeting decided upon three matters by a vote of forty-six in the affirmative, two in the negative, and one not voting, they were—*first,* to install the newly elected officers that evening; *second,* to sever the relationship of the Northside church with the Christian Reformed Church and the classis of Hudson; and *third,* to call the defendant Van Den Heuvel as pastor, and provide for installing him. On the following day (January 8th) notice of this action was sent to the Hudson classis by a communication purporting to be signed by the president and secretary of the consistory; and on the same day the defendants took proceedings for the calling of a meeting for the evening of the next day (January 9th) ostensibly to ratify the illegal acts of January 7th. This meeting was not called in the usual manner, by the consistory, but was called by nine persons who claimed to be members of the congregation, and who so described themselves in the notice, which reads as follows:

"PASSAIC, N. J., January 8, 1912.

"We, undersigned members of the Northside Christian Reformed Church of Passaic, N. J., members in full communion, call a consistory meeting to be held Thursday, January 9, 1912, at eight o'clock, in the church building on the southwest corner of Myrtle avenue and Burgess Place, Passaic, N. J., with the intention to decide concerning the relation in the case of severing from classis of Hudson, and what further lawfully may be brought before the gathering."

This notice was printed and was served some time during January 8th, partly by personal service, but mostly by leaving copies at the residence of the members. The supreme court in its opinion declared that this meeting was a valid meeting. From that proposition I most respectfully dissent, and I do it with great reluctance and with great deference to the opinion of

that court.   My reasons are—*first,* that it was called by people without authority, and not by the consistory, nor in the usual manner, the consistory had nothing to do with it; *second,* the notice was for a consistory meeting only, while the meeting that was held was a meeting of the congregation; *third,* the only matter to be acted upon according to the notice was "concerning the relations in the case of severing from classis of Hudson, and what further lawfully may be brought before the gathering;" *fourth,* it was called on too short a notice to be fair or to obtain a fair representation of the general body of the congregation.   Most of the members of this congregation are working men, and those who were served with notice of the meeting by leaving the notices at their places of abode could not have received the same until they reached their respective homes at the end of the day, and even then they were only notified of a consistory meeting.

I do not think that any valid action could be taken at a meeting so called and held.   It is therefore clear that the action that was taken on January 7th to ordain the elders and deacons to sever the connection with the Hudson classis and to elect the Rev. Mr. Van Den Heuvel as pastor of the church were irregular and could not be and were not ratified by the meeting held on January 9th.   It may be doubted whether the action that was taken at the meeting January 9th had any effect whatever.   The minutes state that the president explained to the meeting that it was called for the purpose of approving and ratifying the proceedings of the previous Sunday mentioned in the minutes, a much broader call than is contained in the notice of the meeting; the minutes were read and opportunity given for correction; the names of all the persons who had voted in favor of the resolution, and also of the five who had later voted in favor, were read, and no adverse vote having been received, the president asked for a rising vote, "which disclosed that the minutes were accepted, approved and established by unanimous vote."

It next appears that in accordance with the church rules the matters in dispute were submitted to what is known in that denomination as a double consistory, composed of the consistory of the church in which the differences exist, and the consistory

of an adjoining church; that this double consistory decided
in favor of the complainants, that their action was taken up by
the classis of Hudson and there ratified, and finally these de-
cisions were ratified by the general synod of the whole church,
which decision is made final by section 18 of the Religious So-
cieties act. *Comp. Stat. p.* 4316. In my opinion *Pulis* v. *Iser-
man, supra,* does not apply. In that case there was no question
of notice, and the action of the congregation was unanimous.

The rules of law relating to freedom of action by independent
churches and congregations are different from those rules which
apply to congregations which are affiliated with and are sub-
ordinate to higher judicatories. Independent churches may do
what they please with their property, provided legal action is
taken to that end, but when a religious society becomes affiliated
with other religious societies and they unite to construct and
maintain for their mutual advantage higher judicatories to
which they subject themselves, then the individual society or
worshiping unit holds its property and temporalities under an
obligation to continue the affiliation until it can be broken by
mutual consent; and if secession is attempted by a faction,
however large or however small, such faction will not be allowed
to carry the church property with it, certainly not so long as
there is a loyal body which is recognized by the superior judica-
tory. Such is the case here. This congregation is about evenly
divided. The complainants and their adherents are recognized
by the Hudson classis as the officers and members of the North-
side church; they have kept up the congregation and church
exercises without any break. The defendants and their ad-
herents have attempted to secede, and are not recognized by the
classis of Hudson as having official relations with the higher
judicatories of the Christian Reformed Church. The worship-
ing units of this denomination in a particular locality form a
classis which has jurisdiction over the churches within its ter-
ritory. The supreme body is a synod which has jurisdiction
superior to that of the classis. This organization makes a com-
pact and zealous body of Christian worshipers who have volun-
tarily bound themselves by the obligation that I have mentioned.

It is not contended that the individual members may not

secede from the individual churches; it is conceded that they may; but may any faction, however large, secede and take with them the church property in a case where there remains a body which is loyal to the former affiliation? This question must be answered in the negative. *American Primitive Society* v. *Pilling, 24 N. J. Law (4 Zab.) 653; True Reformed Church* v. *Iserman, 64 N. J. Law (35 Vr.) 506; Pulis* v. *Iserman, 71 N. J. Law (42 Vr.) 408.* The principle here adopted is well stated in the article on religious societies (*24 Am. & Eng. Encycl. L. (2d ed.) 354*), as follows:

"In case of a schism in a church which is in connection with and a constituent part of an ecclesiastical organization, and which has a head invested by its constitution or recognized usage with other supervisory and supreme control over the constituent part to determine all questions producing schisms and divisions between the members, and to recognize and decide what faction is in the right, it is a well-settled law of the civil courts that the title to the property is in that part of the congregation which is acting in harmony with its own law and the ecclesiastical laws, usages, customs and principles which were accepted among them before the dispute began, are the standards for determining which party is in the right." *Schnorr's Appeal, 67 Pa. St. 138; 5 Am. Rep. 415.*

There remains to be considered but one question, and that is What is the status of the defendants? They were at one time elected trustees of the Northside church, and it was by virtue of their office as such trustees that they were enabled to obtain and hold possession of the church property, but having voluntarily severed their connection with the Christian reformed church, and having become members of another denomination, have they not by their own act so far renounced their trusteeship as that they can no longer represent the church society in that capacity or any longer meddle with its property and affairs. In my opinion this is the position in which they stand. The whole proceeding looks to me like a highhanded and lawless attempt to appropriate this church building and property to the uses of a faction of the congregation, every one of which has lost his membership in the church and has become a member of a church of a different denomination. While it is incompetent for this court to oust a trustee from his office as trustee of a religious

society it, however, does have the power and jurisdiction to declare that such a person has by his own act voluntarily renounced his office, and in this case that is what I believe the defendants have done. They no longer act as trustees for the Northside Church of the Christian Reformed Church of Passaic; they are acting as trustees of a church of an entirely different denomination, and the effect of that is that they cannot be considered trustees of this society. The same thing is true of Van Den Heuvel. He was under ecclesiastical censure at the time the secession took place and had been deprived of his right to minister to the congregation, which action had been sustained by the superior judicatories of the church. It was therefore unlawful for him to occupy the pulpit of that church and to accept a call to be its pastor and to officiate as the minister of the church until the ecclesiastical censures were removed. By his own voluntary act also he has renounced his connection with the Northside church, and should not be permitted to officiate as its pastor.

I must therefore hold that the complainants constitute the trustees of the Northside church, and that they, and they alone, have authority over the church property, and that they and their adherents constitute the religious society known by the name of the Christian Reformed Church of Passaic, New Jersey.

The decree should be for the complainants and should adjudicate that the complainants are the sole trustees of the Northside church, and that they are entitled as such to the custody and possession of the church property. The defendants should be restrained from intermeddling with the property or from diverting it or attempting to divert it from the denomination known as the Christian Reformed Church of America, and from retaining possession of or holding the property and temporalities of the church. Whatever may be necessary to place the complainants in full possession of the church property should be included in the decree. There should likewise be an injunction against Van Den Heuvel restraining him from acting as pastor of the church or in any way ministering to the congregation as pastor.

This decree will carry costs against the defendants.

At the opening of the final hearing thirty-seven persons claiming to be members of the Northside church filed their petition praying leave to intervene as parties complainant under the complainants' invitation to come in as such parties. The decision of the motion was postponed until the final disposition of the cause. There seems to be no reason why they should not be admitted.