Pursuant to a decree advised by me in this matter (101 N.J. Eq. 145) an election was held under the supervision of a special master appointed by the court for that purpose and a new board of trustees, consisting of twelve members, was chosen. Since that time disputes have occurred and controversies arisen concerning the respective rights of the pastor and the trustees and respecting the status of members of the uptown chapel congregation. The board has refused to recognize the defendant Rudisill as pastor and will not permit him to officiate either at meetings of the board or at services held in the church. Some members of the board demanded from the pastor the keys of the chapel and he surrendered them and the chapel was thereupon closed by these individuals. Upon appropriate application the court ordered it reopened and the keys returned to the pastor pending settlement of these disputes and the determination of the rights of the respective parties.
In my former opinion filed herein, I held that those members of the church who had left it and had gone to the uptown church were seceders, but that the doors of the church would be held open to permit them to return if they desired to do so. After the election of the new trustees the board, by notice in writing read at a chapel meeting, invited all who worshiped there to return to the main church downtown and worship there. None of the members thus invited did actually return although the pastor sent to the trustees a notice containing the names of a large number of the chapel members stating that the members named desired to return and that they accepted the board's invitation to do so. Notwithstanding this fact, those members continued to worship in the chapel under *Page 235 
the guidance of the defendant Rudisill and by their actions refused and failed to comply with the terms of the invitation of the trustees. It was several weeks thereafter that the chapel was closed and reopened, as above mentioned. It is quite obvious that the chapel members named neither desired nor intended to worship at the downtown church and that the notice from the pastor to the trustees was merely an attempt to acquire for those members the legal right to participate in congregational meetings. Not having availed themselves of the privilege extended to them by the court and offered by the trustees, their position is now that of non-members who have no right to participate in such meetings.
At the inception of this litigation the defendant Rudisill was undoubtedly the duly elected pastor of the Church of the Holy Trinity and there is nothing before me indicating that that relationship has ever been formally terminated. It is true that he left the church and was among the seceders, but he claims that he has offered to return to the downtown church and assume the duties of pastor there but that the trustees and members will not permit him to do so. This is not denied; but it is claimed that he has forfeited his rights as pastor and that the trustees and members are under no obligation to him whatever. For the purposes of this decision that may be conceded, but if so, no official action has been had either by the board of trustees, or the congregation to formally terminate his pastorate. Until that is done, he is, technically, at least, the pastor, and as such entitled to officiate at all meetings, both temporal and spiritual.
While the church property and all other real estate used by the uptown and the downtown groups is owned by the original society and is subject to its control and disposition, the constitution and by-laws of this organization do not specify or clearly determine the respective rights of the board of trustees or the congregation in opening or closing the chapel as a place of worship. Affidavits of the pastor and other church authority are in conflict on this point. It appears from the evidence in the main case, however, that the chapel was originally opened by a vote of the congregation. The interpretation of the constitution and by-laws by this church organization, *Page 236 
as disclosed by their own acts, will be adopted as the interpretation controlling the present issue. If the chapel is closed now it must be by action of the congregation by a majority vote; but conceding, for the purpose of argument only, that the board of trustees was invested with the legal right and power to close the chapel, there is nothing before me to show that that board ever took any official action in the matter. What was done, so far as appears from the record, was the individual act of two or three members of the board without any authority from the board itself. Members cannot act individually without collective authority.
I will advise an order in accordance with these conclusions.